**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| **CYTIMMUNE SCIENCES, INC.,** | * | |
| **Plaintiff,** | * | |
| v. | * | Case No.: PWG-16-1010 |
| **GIULIO PACIOTTI,** | * | |
| **Defendant.** | * | |
|  | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

On February 17, 2016, Giulio Paciotti, Ph.D. ended approximately twenty-eight years of employment at CytImmune Sciences, Inc., ("CytImmune") where he most recently worked as Chief Science Officer.  There, he focused on nano-technology, specifically a theragnostic[1] called the "Aurimmune Platform," which employed gold to diagnose and treat cancerous solid tumors. He began employment as the Vice President of Research and Development at Senior Scientific LLC ("Senior Scientific") two days later.  His work continues to target cancerous solid tumors but now employs iron oxide in lieu of gold and focuses, at least for now, on diagnosing, not treating, cancerous tumours. Within a month, CytImmune filed suit against Dr. Paciotti in the Circuit Court for Montgomery County, claiming that he breached the confidential information and restrictive covenants of the Assignment of Inventions, Non-disclosure, Non-solicitation and Non-competition Agreement it had entered into with Dr. Paciotti, as well as breached the duty of

---

[1] "Theragnostic" is a neologism that stands for a medical process that has the capacity both to diagnose and treat.

loyalty.  ECF Nos. 2, 32.[2]  CytImmune also sought injunctive relief in the form of a temporary restraining order and preliminary and permanent injunction.  *Id.*  Along with its Verified Complaint, CytImmune filed a Motion for a Temporary Restraining Order and Preliminary Injunction.  ECF No. 3.

The state court denied the motion for a temporary restraining order, ECF No. 10, and Dr. Paciotti removed to this Court, ECF No. 1, where CytImmune renewed only its Motion for a Preliminary Injunction, ECF No. 30.[3]  On May 12, 2016, I held a hearing on CytImmune's motion and denied the motion without prejudice to resubmission following discovery and trial on the narrow issue of whether CytImmune is precluded from enforcing the Agreement because it materially breached it by failing to pay Dr. Paciotti his full salary.  This Memorandum Opinion and Order memorializes the findings of fact and conclusions of law I reached during the hearing.

## Preliminary Injunction

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  As a preliminary injunction is "an extraordinary remedy . . . [it] may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain a preliminary injunction, the

---

[2] I refer to the agreement in its entirety as "Agreement" and the restrictive covenant as "Non-compete Agreement."  Although the Verified Complaint refers to the Agreement and states that it is attached as Exhibit A, there is no attachment to the Complaint; the Agreement appears instead as Exhibit 1 to Defendant's Opposition, ECF No. 34-1.

[3] The parties fully briefed the motion, ECF Nos. 3-1, 30, 34, and 40, and submitted voluminous exhibits, ECF Nos. 30-1 – 30-15, 34-1 – 34-8, 35, 35-1 – 35-19, and 40-1, all of which I admitted into evidence at the May 12, 2016 hearing, along with additional exhibits that the parties presented at the hearing.

plaintiff must "establish that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Id.* at 20; *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).[4] "A preliminary injunction cannot be issued unless all four of these elements are met, and '"[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction."'" *Williams v. JP Morgan Chase Bank*, No. RDB-16-00312, 2016 WL 509426, at *3 (D. Md. Feb. 4, 2016) (slip op.) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted)). "[T]he burden placed upon Plaintiffs to state a claim for a preliminary injunction is high." *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 538 (D. Md. 2014); *see Fowler v. Wells Fargo Home Mortg., Inc.*, No. GJH-15-1084, 2015 WL 2342377, at *2 (D. Md. May 13, 2015) (same).

To succeed on the merits, under Maryland law, an employer seeking to enforce a non-compete agreement must show that:

> all of the following four conditions are met: "(1) the employer must have a legally protected interest; (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest; (3) the covenant cannot impose an undue hardship on the employee; and (4) the covenant cannot violate public policy."

*MCS Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010) (quoting *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. App'x 435, 438 (4th Cir. 2004) (interpreting Maryland law)); *see also Gen. Parts Distribution, LLC v. St. Clair*, No. JFM-11-

---

[4] The Agreement provides that Maryland law governs, Agr. ¶ 14, and I will apply Maryland law to consider CytImmune's likelihood of success on the merits. However, "[t]he grant of preliminary injunctions in diversity cases, as well as those of original jurisdiction, is subject to federal standards." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991).

3556, 2011 WL 6296746, at *3 (D. Md. Dec. 14, 2011) (same).

To meet the first requirement, the plaintiff must "clearly demonstrate that he will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346–47 (4th Cir. 2009) (emphasis from the original). Only "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and *Iqbal*" does not meet the rigorous standard required under the *Winter* and *Real Truth* decisions. *Allstate Ins. Co. v. Warns*, No. CCB-11-1846, 2012 WL 681792, at *14 (D. Md. 2012). Relevant to the present case is that post-*Real Truth* courts have "declined to issue a preliminary injunction when there are significant factual disputes" in breach of contract cases. *Chattery Int'l, Inc. v. JoLida, Inc.,* No. WDQ-10-2236, 2011 WL 1230822, at *9 (D. Md. 2011) (citing *Allegro Network LLC v. Reeder,* No. 09-912, 2009 WL 3734288, at *3 (E.D. Va. Nov. 4, 2009) (holding that the parties' conflicting versions of facts key to determining whether a breach of a franchise agreement occurred prevented the plaintiff from making a clear showing of the likelihood of success on the merits)); *see Torres Advanced Enter. Sols. LLC v. Mid-Atl. Prof'ls Inc.*, No. PWG-12-3679, 2013 WL 531215, at *3 (D. Md. Feb. 8, 2013) ("In the present case, the record highlights multiple unresolved factual disputes. As the resolution of these disputes is central to the determination of a breach of contract claim, Plaintiff is prevented from making a clear showing of a likelihood of success on the merits.").

### Validity of Non-compete Agreement at Time of Alleged Breach

A condition precedent to enforcing a non-compete agreement is that there is a valid, applicable non-compete agreement in effect. "It is well established that an agreement is binding and enforceable only if it is a valid contract supported by consideration." *Hearn Insulation & Improvement Co. v. Carlos Bonilla*, No. AW-09-990, 2010 WL 3069953, at *6 (D. Md. Aug. 5,

2010) (citing *Cheek v. United Healthcare of the MidAtl., Inc.*, 835 A.2d 656, 661 (Md. 2003)). In the context of a restrictive covenant, "continued employment of an at-will employee for a significant period constitutes sufficient consideration . . . where there is no allegation of bad faith or other compromising circumstance." *Id.* (citing *Simko, Inc. v. Graymar Co.*, 464 A.2d 1104, 1107–08 (Md. Ct. Spec. App. 1983)). In this case, Dr. Paciotti's more than ten years of continued employment after signing the Agreement in 2005 more than suffice for consideration. *See id.* (concluding that, "[o]bviously, continuance of employment for a period of ten years imparts sufficient consideration").

Thus, the question here is not whether the Non-compete Agreement was supported by sufficient consideration when it came into existence. Rather, it is whether, as Dr. Paciotti argues, CytImmune materially breached its employment relationship with him by failing to pay his full salary, prior to his alleged breaches of the Agreement, such that the Agreement and the Non-compete Agreement it encompassed no longer are enforceable. Indeed, if an employer materially breaches an employment agreement that includes a restrictive covenant, its former employee's "non-compete obligations under the agreement are discharged." *Jorgensen v. United Commc'ns Grp. Ltd. P'ship*, No. 10-429-AW, 2011 WL 3821533, at *10 (D. Md. Aug. 25, 2011) (citing *Jay Dee/Mole Joint Venture v. Mayor of Balt.*, 725 F. Supp. 2d 513, 528 (D. Md. 2010)); *see Maternal-Fetal Med. Assocs. of Md., LLC v. Stanley-Christian*, No. 0967 Sept. Term 2009, 2013 WL 3941970, at *7 (Md. Ct. Spec. App. July 24, 2013) (unreported) ("An employee defending against a claim for breach of non-competition provision by her former-employer may assert evidence that the employer had breached the employment agreement such that the employee's duty to perform under the non-competition agreement was extinguished.").

Significantly, "[a]lthough any breach of contract may give rise to a cause of action for

damages, only a *material breach* discharges the non-breaching party of its duty to perform." *Jay Dee/Mole Joint Venture*, 725 F. Supp. 2d at 526 (citing Restatement (Second) of Contracts § 236 cmt. a.; 23 Williston on Contracts § 63:3 (4th ed.)) (emphasis added). Maryland law provides that "'[a] breach is material "if it affects the purpose of the contract in an important or vital way."'" *Id.* (quoting *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (quoting *Sachs v. Regal Sav. Bank, FSB,* 705 A.2d 1, 4 (Md. Ct. Spec. App. 1999))). "[W]hat constitutes a 'material breach' of an employment contract is not subject to 'a mathematically precise definition' but rather 'varies with the nature of the particular employment.'" *Gresham*, 404 F.3d at 260 (quoting *Shapiro v. Massengill*, 661 A.2d 202, 211 (Md. Ct. Spec. App. 1995)).

Dr. Paciotti suggests that CytImmune's failure to pay his full salary constitutes a material breach. Yet, even if a reduction in salary may constitute a material breach, parties to a contract may "'modify it by mutual consent,'" through "'implication as well as by express agreement.'" *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 978 (Md. 2011) (quoting *Freeman v. Stanbern Constr. Co.*, 106 A.2d 50, 55 (Md. 1954)). Thus, by continuing to work for CytImmune at a reduced salary, Dr. Paciotti may have agreed to the reduced salary, and CytImmune argues that this is exactly what occurred. "A modification [such as by course of conduct] creates a new contract." *Dep't of Pub. Safety & Corr. Servs. v. ARA Health Servs., Inc.*, 668 A.2d 960, 967 (Md. Ct. Spec. App. 1995) (noting that a "meeting of the minds [is] required to modify a contract").

In this regard, *Ruhl v. F.A. Bartlett Tree Expert Co.*, 225 A.2d 288, 289 (Md. 1967), is on point. There, the trial "was limited to the issue of whether the parties had agreed to a modification of the original contract respecting compensation or whether there had been a material breach by the company in changing the compensation." The trial court "found that Ruhl

impliedly agreed to the modification of his employment contract by the sumbstitution [sic] of a new pay plan for the the [sic] former one," such that "the contract of employment, including the covenant not to compete, was valid," and it enforced the non-compete covenant. *Id.* at 290. On appeal, "the sole issue [was] the validity of the restrictive covenant," and the Court of Appeals affirmed its validity. *Id.* at 290, 294.

*Francorp, Inc. v. Siebert*, 126 F. Supp. 2d 543, 547 (N.D. Ill. 2000), with analogous facts to this case, also provides guidance.[5] Francorp first employed defendant Siebert in 1985; ten years later, he became president of the company. *Id.* at 544. In 1997, Francorp experienced financial troubles; to mitigate, it laid off some employees, while others voluntarily took pay cuts. *Id.* Thus, the defendants "tolerated late paychecks for a time and exhibited an understanding toward Francorp's financial condition." *Id.* at 547. Its efforts to correct its financial difficulties did not succeed, and in 1998 Siebert and defendant Levy left Francorp and formed their own company. *Id.* Defendants Payne, Ludes, and Janusz then joined them. *Id.* at 544. All departing former employees left Francorp because it had not paid them for six to fourteen weeks, while their employment agreements called for bi-weekly pay. *Id.* at 544, 546. Francorp sued them for, *inter alia*, breach of the restrictive covenant each entered into, asserting that the lack of pay was pretext, and that the employees had been plotting to leave for a long time. *Id.* at 545. The former employees raised several challenges to the enforceability of the restrictive covenants, including whether Francorp's "failure to pay them in a timely fashion constituted a breach of the employment relationship between Francorp and the defendants, thereby excusing defendants from any obligations they had under the restrictive covenants." *Id.* at 545–46. The court concluded that "Francorp materially breached its employment relationship with defendants . . .

---

[5] Although the Northern District of Illinois applied Illinois contract law, Illinois contract law with regard to enforceability of restrictive covenants is essentially the same as Maryland law.

7

by failing to pay them for a substantial period prior to their departure from the company," and that breach excused the employees from their obligations under the restrictive covenant. *Id.* at 547.

The court observed that "[t]he materiality of a breach depends on the 'inherent injustice of the matter,' and on 'whether the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it.'" *Id.* at 547 (quoting *Arrow Master, Inc. v. Unique Forming, Ltd.*, 12 F.3d 709, 714–15 (7th Cir. 1993) (citations and quotation marks omitted)). This parallels Maryland law that materiality "is not subject to 'a mathematically precise definition' but rather 'varies with the nature of the particular employment.'" *Gresham*, 404 F.3d at 260 (quoting *Shapiro*, 661 A.2d at 211). In concluding that the breach was material, the court reasoned that the former employees "were out a substantial amount of money for lengthy periods of time. Bills, mortgages and other financial obligations undoubtedly weighed upon them. . . . By any measure, Francorp's failure to pay defendants constituted a material breach of the agreement between the parties." *Francorp*, 126 F. Supp. 2d at 547.

### Findings of Fact and Conclusions of Law

Dr. Paciotti co-founded CytImmune, which then was known as Assay Research, along with Dr. Lawrence Tamarkin, its current president. Dr. Paciotti worked for CytImmune from 1998 until February 17, 2016. At the time he resigned, he was Chief Science Officer. Two days later, on February 19, 2016, he began working as Vice President of Research and Design at Senior Scientific.

In 2005, while still with CytImmune, Dr. Paciotti signed an Assignment of Inventions, Non-disclosure, Non-solicitation and Non-competition Agreement. Paragraph 7 is a "Non-

Competition Covenant" that provides, in part:

>       As a material inducement to the Company to enter into this Agreement, I covenant and agree that without the Company's prior written consent, during my employment with the Company and for a period of two (2) years following the termination of my employment, whether such termination be with or without reason, I shall not enter the employ of any Competitor, nor engage during such period, directly or indirectly, voluntarily or involuntarily, as principal, agent, officer, employee or otherwise, anywhere in the United States, Canada, Europe, Japan, Taiwan, China or India, in any actions to divert or take away any customer or supplier, or provide services to, invest in, act as an advisor, director, consultant, contractor or agent to, participate in the ownership or management of or enter into the employ of, any Competitor, or assist in any manner any Competitor, or otherwise compete with the Company in the sale or licensing, of any products or services competitive with the products or services developed or marketed by the Company in the United States, Canada, Europe, Japan, Taiwan, China or India.

Agr. ¶ 7.2. Paragraph 7.1 defines "Competitor." The geographic scope of the Non-Compete Agreement includes the United States, Canada, Europe, Japan, Taiwan, China and India. *Id.* Under the Agreement, Dr. Paciotti agreed that Maryland state law would govern its interpretation and waived all rights to a jury trial of disputes regarding the Agreement. *Id.* ¶ 14.

The Agreement explicitly states that it "does not constitute a contract of employment or obligate [CytImmune] to employ [Dr. Paciotti] for any stated period of time," and that he was "an 'at will' employee" who could be "terminated at any time, for any reason or for no reason." *Id.* ¶ 21. Thus, the Non-compete Agreement is not a clause of an employment contract. Regardless, the Agreement expressly states that it is "[i]n consideration, and as a condition of [Dr. Paciotti's] employment or continuing employment with [CytImmune]." *Id.* at 1. Further, in the Agreement, Dr. Paciotti agreed that he was "entering into th[e] Agreement as a condition of [his] employment or continuing employment with [CytImmune]." *Id.* ¶ 1. Therefore, the Agreement is inextricably intertwined with CytImmune's obligations and responsibilities as Dr. Paciotti's employer; otherwise there is no consideration to support it. Moreover, implicit in the notion of continued employment is paid employment. *See Francorp*, 126 F. Supp. 2d at 546 ("It

9

is axiomatic that an employer's failure to compensate its employees violates the employment relationship."); *Martinez v. K & S Mgmt. Servs., Inc.*, No. PWG-15-223, 2016 WL 808797, at *6 (D. Md. Mar. 2, 2016) (noting that federal and Maryland law require payment of minimum wages, regardless of any agreement by employees to a payment scheme resulting in wages below minimum wage; citing 29 U.S.C. § 206; Md. Code Ann., Lab. & Empl. § 3-413). Were this not so, an employer could withhold pay while insisting that an employee was fully employed, getting the benefit of a non-compete agreement without providing the quid pro quo.  Consequently, a material breach of CytImmune's obligation to pay Dr. Paciotti as its at-will employee would discharge Dr. Paciotti's obligations under the Non-compete Agreement. *See Jorgensen v. United Commc'ns Grp. Ltd. P'ship*, No. 10-429-AW, 2011 WL 3821533, at *10 (D. Md. Aug. 25, 2011); *Jay Dee/Mole Joint Venture v. Mayor of Balt.*, 725 F. Supp. 2d 513, 528 (D. Md. 2010)); *Maternal-Fetal Med. Assocs. of Md., LLC v. Stanley-Christian*, No. 0967 Sept. Term 2009, 2013 WL 3941970, at *7 (Md. Ct. Spec. App. July 24, 2013).

    Dr. Paciotti's affidavit and testimony establish his salary and the payments he received. From 2008 through 2015, his annual salary was $180,000.  CytImmune characterizes this as a "target" salary, but does not deny the amount.  Yet Dr. Paciotti never received $180,000 in any given year during this time period.  The most he received in a year was in 2014, when CytImmune paid him $169,585 (94.2%).  In 2015, his final year, Dr. Paciotti received only $64,650, or 35.9% of his annual salary.  Indeed, up until December that year, he received only $27,150, having been furloughed in January because CytImmune lacked sufficient funds to pay him.  Dr. Tamarkin wrote a letter dated June 12, 2015 stating that Dr. Paciotti had been furloughed for lack of funds to pay his salary since January 2, 2015.  He received an additional $37,500 in December 2015.  In 2015, and earlier in 2009, Dr. Paciotti applied for and received

unemployment compensation from the State of Maryland. In 2013, he received only $42,751, or 23.7%. Between 2008 and 2015, CytImmune failed to pay Dr. Paciotti a total of $574,062 in salary. He only received 60.1% of the base salary that CytImmune owed him for that time period.

According to CytImmune, the stockholders, including Dr. Paciotti, agreed to forego salary and receive "sweat equity" instead. Dr. Paciotti disputes this testimony, insisting that he never agreed to accept a lower salary. But, in a 2013 email to CytImmune's Chief Legal Officer Mitchell Marder, which CytImmune introduced as Exhibit 7 at the hearing, Dr. Paciotti stated that he was not asking for a salary and agreed to work without compensation. This evidence establishes that, at least in 2013, Dr. Paciotti agreed to forego compensation.

Yet, a later email exchange Dr. Paciotti had with Marder on July 2, 2015, six months before his resignation, portrays different circumstances, in which he appeared panicked about how he could manage without a salary and discussed applying for other employment. Certainly, that email should have alerted senior management at CytImmune that Dr. Paciotti did not agree to the salary reduction and was looking for new employment because he was not being paid. However, Marder testified that Dr. Paciotti periodically discussed his salary and talked about seeking other employment, but never followed through, such that Marder did not take his threatened resignation seriously.

The exhibits attached to Dr. Paciotti's Opposition confirm CytImmune's precarious financial condition at the time Dr. Paciotti resigned, including the fact that CytImmune was seeking not capital investments but public donations. Additionally, CytImmune was representing that it was "running out of time" to get its Aurimmune Platform into Phase II clinical trials, needed to raise $1 million, needed support, and could not wait any longer, and

without financial support, the Aurimmune treatment might not survive.

On the facts before me, a significant dispute exists regarding the pivotal fact of how much CytImmune was obligated to pay Dr. Paciotti annually. His salary may have been set at $180,000 each year for 2008–2015, or that may have been a target amount. Additionally, Dr. Paciotti may have agreed to a salary reduction, or "sweat equity," in lieu of monetary payments, within the past two years, such that any breach by CytImmune would have come too late to release him from the Non-Compete Agreement at the time he began to work for Senior Scientific. The materiality of the change in compensation also is disputed, as CytImmune views the sweat equity as a sufficient substitute for salary, but Dr. Paciotti testified that, with only his reduced salary, he could not make his mortgage payments. It is disputed whether, given "the nature of the particular employment"—a biotechnology company in the initial phases of a clinical trial—this change in compensation affected the employment relationship in "an important or vital way." *See Gresham*, 404 F.3d at 260. Nonetheless, under these facts, CytImmune ultimately *may* succeed on the merits. *See Ruhl*, 225 A.2d at 289 (concluding that employee agreed to modified payment and therefore the restrictive covenant still was valid).

But the preliminary injunction standard is not whether it is *plausible* for a plaintiff to succeed, but whether it is *likely*. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011); *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346–47 (4th Cir. 2009). As noted, significant factual disputes exist as to whether, by reducing his salary, CytImmune failed to pay Dr. Paciotti according to the agreed-upon terms of his employment, that is, whether it materially breached its employment relationship with him, releasing him from the Non-compete Agreement. Indeed, Dr. Paciotti, like the defendants in *Francorp*, was "out a substantial amount

of money for lengthy periods of time," during which his "[b]ills, mortgage[] and other financial obligations undoubtedly weighed upon" him, which supports the finding that the failure to pay his full salary was a material breach to the employment relationship. *See Francorp*, 126 F. Supp. 2d at 547.  As the Northern District of Illinois observed in *Francorp*, "tolerat[ing] late paychecks for a time and exhibit[ing] an understanding toward [the company's] financial condition" is not tantamount to "agree[ing] to work for free."  *See id.*  I cannot conclude on the disputed facts before me that CytImmune is likely to succeed on the merits of its claim that Dr. Paciotti breached an enforceable Non-compete Agreement.  *Torres Advanced Enter. Sols. LLC v. Mid-Atl. Prof'ls Inc.*, No. PWG-12-3679, 2013 WL 531215, at *3 (D. Md. Feb. 8, 2013); *Chattery Int'l, Inc. v. JoLida, Inc.,* No. WDQ-10-2236, 2011 WL 1230822, at *9 (D. Md. 2011); *Allegro Network LLC v. Reeder,* No. 09-912, 2009 WL 3734288, at *3 (E.D. Va. Nov. 4, 2009).  Therefore, at this time, I must deny Plaintiff's Motion for a Preliminary Injunction.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).  In so doing, I am setting an expedited trial on the narrow issue of material breach for fourteen weeks from now, a time period too short for Senior Scientific to be able to develop a competitive advantage of obtaining FDA approval of its nano-diagnostic/therapeutic product for clinical trials.

Accordingly, it is, this 10th day of June, 2016, for the reasons stated in this Memorandum Opinion and Order, as well as on the record at the May 12, 2016 hearing, hereby ORDERED that

1. Plaintiff's Motion for a Preliminary Injunction, ECF Nos. 3 & 30, is denied without prejudice to resubmission following targeted discovery and trial on the narrow issue of whether CytImmune materially breached the Agreement;

2. This first phase of discovery, focusing only on the issue of material breach, will

conclude Monday, July 11, 2016;

3. The parties will submit a schedule for summary judgment briefing[6] on this narrow issue by June 17, 2016, with opening briefs not to exceed twenty-five pages and the reply brief(s) not to exceed fifteen pages;

4. If the issue is not resolved on summary judgment, or if I have not ruled on the motion(s) by August 23, 2016, a bench trial on this issue is set for August 23-26, 30-31;

5. Plaintiff's Motion to Disqualify Counsel, ECF No. 27, remains pending and its resolution will not impact the trial dates (so Dr. Paciotti must be prepared to proceed to trial on August 23 regardless of whether his current counsel continues to represent him);

6. If, on summary judgment or at trial I find that CytImmune has not materially breached the employment relationship, the case will proceed to Phase 2 discovery to address any remaining issues regarding the enforcement of the Non-compete Agreement.

                                                                                       /S/
                                                                   Paul W. Grimm
                                                                 United States District Judge

---

[6] Logically, Dr. Paciotti should file any motion for summary judgment, and CytImmune should oppose it. Should both parties file summary judgment motions, they must comply with the procedure provided in Loc. R. 105.c(c).