**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
***Southern Division***

| | | |
|---|---|---|
| **CYTIMMUNE SCIENCES, INC.,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: PWG-16-1010** |
| **GIULIO PACIOTTI,** | * | |
| **Defendant.** | * | |

* * * * * * * * * * * * * *

**MEMORANDUM OPINION**

Following a four-day bench trial at which I found that Plaintiff CytImmune Sciences, Inc. ("CytImmune") did not materially breach the Assignment of Inventions, Non-Disclosure, Non-Solicitation and Non-Competition Agreement ("Agreement") that Defendant Giulio Paciotti entered into while working for the company, CytImmune renewed its Motion for a Preliminary Injunction. CytImmune sought to enjoin Dr. Paciotti from working for Senior Scientific, LLC ("Senior Scientific") during the pendency of this litigation. Because CytImmune failed to show that it is likely to succeed on the merits of its claim to enforce the Agreement and because of the hardship an injunction would impose upon Dr. Paciotti, I denied CytImmune's Motion. This Memorandum Opinion memorializes my rulings from trial.

## I. BACKGROUND

The Court previously outlined the essential facts of the case:

> On February 17, 2016, Giulio Paciotti, Ph.D. ended approximately twenty-eight years of employment at CytImmune Sciences, Inc., ("CytImmune") where he most recently worked as Chief Science Officer. There, he focused on nano-technology, specifically a theragnostic called the "Aurimmune Platform," which

> employed gold to diagnose and treat cancerous solid tumors. He began employment as the Vice President of Research and Development at Senior Scientific LLC ("Senior Scientific") two days later. His work continues to target cancerous solid tumors but now employs iron oxide in lieu of gold and focuses, at least for now, on diagnosing, not treating, cancerous tumours [sic]. Within a month, CytImmune filed suit against Dr. Paciotti in the Circuit Court for Montgomery County, claiming that he breached the confidential information and restrictive covenants of the Assignment of Inventions, Non-disclosure, Non-solicitation and Non-competition Agreement it had entered into with Dr. Paciotti, as well as breached the duty of loyalty.

Mem. Op. & Order 1–2, ECF No. 55.

Dr. Paciotti removed the case to this Court, ECF No. 1, where CytImmune renewed its Motion for a Preliminary Injunction made previously in state court. ECF No. 30. I denied without prejudice CytImmune's Motion subject to resubmission following targeted discovery and a bench trial on the narrow issue of whether CytImmune materially breached the Agreement by failing to pay Dr. Paciotti his full salary, thereby vitiating the Agreement. Mem. Op. & Order 13.

During the bench trial, which took place between August 23 and 26, 2016, I found[1] that no material breach occurred because the parties altered the Agreement through a course of conduct by agreeing either to defer unpaid portions of their salary until CytImmune regained surer financial footing or to forgo the unpaid salary. Dr. Paciotti argued that § 502(f) of the Maryland Wage Payment Law, Md. Code Ann., Lab. & Empl. §§ 3-501 to 3-509, and CytImmune's corporate bylaws voided any such agreement. Def.'s Mem. 28–30, ECF No. 69; Def.'s Reply 6–7, ECF No. 77. These arguments were unavailing. Because Dr. Paciotti has not yet brought a claim under the Maryland Wage Payment and Collection Law or for breach of contract, I am not called upon to determine the precise parameters of the modified contract.

[1] At the conclusion of the bench trial, I made findings of fact and conclusions of law, as required by Fed. R. Civ. P. 52(a), and announced them on the record. I incorporate those findings and conclusions by reference in this Memorandum Opinion, but will not repeat them in detail.

Whether CytImmune's senior managers, including Dr. Paciotti, agreed to defer or forgo unpaid salary, the record clearly shows that Dr. Paciotti at least assented to payment of accrued salary at some indeterminate future date. *See, e.g.*, Email from Attorney Maury S. Epner, on behalf of Dr. Paciotti, to Roger A. Hayden, Attorney for Presidential Bank (Sept. 16, 2013), Jt. Ex. 7 ("Dr. Paciotti is currently not receiving any salary or other workplace compensation. He has been accruing salary since March 1, 2013 and does not know when, *or if*, he will ever be paid this accrued sum." (emphasis added)).[2] Therefore, no material breach occurred.

In light of this conclusion, CytImmune orally renewed its Motion for a Preliminary Injunction. I denied the motion, finding that CytImmune had not demonstrated a likelihood of success on the merits of its contract claim because the Agreement evinces a purpose of stifling competition—which is not a legally protected interest and is contrary to public policy—and because enforcing the Agreement would impose an undue hardship on Dr. Paciotti. This Memorandum Opinion memorializes the findings of fact and conclusions of law I reached during the bench trial.

## II. STANDARD OF REVIEW

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). As a preliminary injunction is "an extraordinary remedy . . . [it] may only be rewarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the plaintiff must "establish that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable

[2] All references to Joint Exhibits refer to a binder of materials submitted jointly by the parties to the Court for trial.

harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Id.* at 20; *see also Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

Prior to 2009, the Fourth Circuit followed a "balance of hardship" approach to preliminary injunctions, considering all four *Winter* elements, but "allow[ing] each requirement to be conditionally redefined" in a "flexible interplay" depending on how the other requirements were met. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (citing *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977)). *Real Truth* invalidated this approach, however, and it "may no longer be applied" in the Fourth Circuit. *Id.* The plaintiff must therefore satisfy each requirement as articulated. *Id.*

## III. DISCUSSION

### A. Likelihood of Success on the Merits

To meet the first requirement, the plaintiff must "clearly demonstrate that he will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Id.* at 346–47. Only "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and *Iqbal*" satisfies the rigorous standard required under the *Winter* and *Real Truth* decisions. *Allstate Ins. Co. v. Warns*, No. CCB–11–1846, 2012 WL 681792, at *14 (D. Md. Feb. 29, 2012).

With specific regard to non-compete agreements, a demonstration of success on the merits also requires the plaintiff to clearly establish that the agreement at issue is enforceable under the governing law. This Agreement is "governed and interpreted in accordance with the internal laws of the State of Maryland, without regard to or application of choice-of-law

principles." Agr. ¶ 14, Jt. Ex. 27. Under Maryland law, an employer seeking to enforce a non-compete agreement must show that:

> all of the following four conditions are met: "(1) the employer must have a legally protected interest; (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest; (3) the covenant cannot impose an undue hardship on the employee; and (4) the covenant cannot violate public policy."

*MCS Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010) (quoting *Deutsche Post Glob. Mail, Ltd. v. Conrad*, 116 F. App'x 435, 438 (4th Cir. 2004) (interpreting Maryland law)); *see also Gen. Parts Distrib., LLC v. St. Clair*, No. JFM-11-3556, 2011 WL 6296746, at *3 (D. Md. Dec. 14, 2011).

For a two-year period, the Agreement prohibits Dr. Paciotti from:

> enter[ing] into the employ of any Competitor [or] engag[ing] during such period, directly or indirectly, voluntarily or involuntarily, as principal agent, officer, employee or otherwise, anywhere in the United States, Canada, Europe, Japan, Taiwan, China, or India, in any actions to divert or take away any customer or supplier of the Company, seek to reduce the amount of business performed or engaged in by the Company with any customer or supplier, *or provide services to, invest in, act as an advisor*, director, consultant, contractor or agent to, participate in the ownership of management of . . . any Competitor, or assist in any manner any Competitor, or otherwise compete with the Company in the sale or licensing of any products or services competitive with the products or services developed or marketed by the Company in the United States, Canada, Europe, Japan, Taiwan, China, or India.

Agr. 7.2 (emphasis added). The Agreement defines "Competitor" as:

> any person, firm, corporation, partnership or other business entity engaged in *or about to become engaged* in the production, licensing, sale, or marketing of any product or service: (a) which is *substantially similar to* or directly competitive with any product or service of the Company . . . ; or (b) which is *based on* technology of the kind or type acquired, developed or being developed, produced, marketed, distributed, planned, furnished or sold by the Company . . . ; or (c) with respect to which [the CytImmune employee has] acquired confidential information.

*Id.* ¶ 7.1 (emphasis added). Essentially, the Agreement appears to prohibit Dr. Paciotti from

working at—or even investing in—any company researching medical nanotechnology in three continents for a two-year period.

The agreement's two-year duration is unobjectionable. Courts applying Maryland law have held two years to be a reasonable duration for a non-compete agreement. *PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002) ("Maryland has consistently upheld two year limitations on employment with competitors as reasonable."); *see also Gill v. Comput. Equip. Corp.*, 292 A.2d 54, 49 (Md. 1972); *Tuttle v. Riggs-Warfield-Roloson, Inc.*, 245 A.2d 588, 589 (Md. 1968); *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (Md. 1967). And while a geographic scope spanning three continents is quite broad, "federal courts applying Maryland law have held that in situations where the plaintiff competes for clients on a global basis, a restriction limited to a narrow geographic area would be meaningless; therefore, the absence of such a restriction is reasonable." *Deutsche Post Glob. Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 756 (D. Md. 2003), *aff'd*, 116 F. App'x 435 (4th Cir. 2004); *see also Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 641–42 (D. Md. 1998); *Hekimian Labs., Inc. v. Domain Sys., Inc.*, 664 F. Supp. 493, 498 (S.D. Fla. 1987) (applying Maryland law).

But courts must assess the reasonableness of a non-compete agreement's scope in light of the "specific facts" of the case. *Ruhl*, 225 A.2d at 291. "Employers have a legally protected interest in preventing departing employees from taking with them the customer goodwill they helped create for the employer." *Deutsche Post*, 116 F. App'x at 438 (citing *Silver v. Goldberger*, 188 A.2d 155, 158–59 (Md. 1963)). One of the Agreement's numerous constituent parts prevents Dr. Paciotti from "divert[ing] or tak[ing] away [CytImmune's] customers . . . ." Agr. ¶ 7.2. But the Agreement goes well beyond that limited purpose by also prohibiting Dr. Paciotti from diverting suppliers away from CytImmune or from "provid[ing] services to,

invest[ing] in, [or] act[ing] as an advisor to" any of CytImmune's competitors. *Id.* And the term "competitor" encompasses more than just companies actively producing nanoparticle technology for cancer-treatment purposes but also those *contemplating* producing or developing technology "substantially similar to" or merely "based on" technology "of the kind being developed by" CytImmune. *Id.* ¶ 7.1.

Maryland law permits courts to preserve otherwise unenforceable non-compete agreements by excising overly broad terms. *Deutsche Post*, 435 F. App'x at 439. But under this "blue pencil" approach, "a court may not rearrange or supplement the language of the restrictive covenant." *Id.* Whittling down the Agreement to its restriction on diverting customers, however, cannot save the agreement. CytImmune has no customers. Its economic viability depends entirely upon its ability through research and development to bring to market nanomedicine technology. *See* Verified Compl. ¶¶ 25–29, ECF No. 2. The parties have cited no case in which a court found that a company researching and developing a product that does not yet exist for hypothetical customers had a legally protected interest in limiting a former employee's ability to find work elsewhere involving technology "substantially similar to" or, even more remotely, "based on" the employer's technology.

That CytImmune buried within a heap of other restrictions a theoretically valid but actually inapplicable limitation geared towards preserving customer goodwill hints at the Agreement's true purpose: stifling competition. In *Deutsche Post*, Judge Frederick Motz refused to enforce a non-compete agreement that prevented former employees of the largest international mail carrier, Deutsche Post Global Mail ("DPGM"), from starting their own small international mail company. *Deutsche Post*, 292 F. Supp. 2d at 756. Because the former employees' small company posed very little threat to the largest player in the relevant market, Judge Motz ascribed

to the agreement a purpose of “stifl[ing] healthy competition,” which he held contrary to “broad public policy.” *Id.* The Fourth Circuit affirmed the lower court’s decision and described the agreement as “sweeping” because it prevented the former employees from “engaging ‘in *any* activity which *may* affect adversely the interests of the Company . . . .’” *Deutsche Post*, 116 F. App’x at 438 (quoting non-competition agreement). According to the court, this language “seem[ed] designed to prevent any kind of competition . . . , which is not a legally protected interest.” *Id.*

The breadth of the Agreement here is far greater than the one in *Deutsche Post*. By prohibiting Dr. Paciotti from even owning stock in or serving in an advisory or managerial role at another nanomedicine company, it prohibits more activity than the type that could conceivably adversely affect CytImmune. If DPGM’s agreement stifled competition, then CytImmune’s attempts to strangle it. The anti-competitive nature of the Agreement is contrary to public policy and reveals CytImmune’s lack of a legally protected interest. *See id.*

Finally, enforcing the non-compete Agreement would impose significant hardship on Dr. Paciotti. Like the other members of senior management at CytImmune, Dr. Paciotti has faced significant financial hardship over the past several years by agreeing to accept—either permanently or temporarily—less than his full salary. *See* Def.’s Mem. 10–11; Pl.’s Opp’n 4–9, ECF No. 74; Sept. 14, 2009 Resolutions of the Board of Directors of CytImmune Sciences, Inc. 7, Jt. Ex. 4; Paciotti 2010–15 W-2 Forms, Jt. Ex. 22. Enforcing this exceedingly broad Agreement would present Dr. Paciotti with the unenviable choice between continuing to work for CytImmune for little or no compensation or discontinuing his work in the nanotechnology field, his livelihood for nearly thirty years.

Perhaps at a later stage in the litigation CytImmune will be able to furnish evidence that the Agreement is more narrowly tailored, less anti-competitive, and less onerous to Dr. Paciotti than it appears on its face. CytImmune has not, however, clearly demonstrated a likelihood of success on the merits of its claim to enforce the Agreement. For that reason, a preliminary injunction is inappropriate. *See Winter*, 555 U.S. at 20.

**B. Other Preliminary Injunction Elements**

Because CytImmune has failed to clearly demonstrate a likelihood of success on the merits, it is unnecessary for me examine the other *Winter* elements at length, but I will address them briefly.

The technologies that CytImmune and Senior Scientific hope to develop are years away from realization. *See* Verified Compl. ¶¶ 4–5 ("As of the date of this filing, CytImmune has received approval from the Food and Drug Administration ('FDA') for clinical trials in humans of a tumor-targeted, metallic nanoparticle ('the Aurimune platform'). . . .[Senior Scientific] has begun *in vitro* and live animal testing of its own tumor-targeted metallic nanoparticle, but it has not yet received approval from the FDA for clinical trials in humans."). Before either startup can realize its financial goals, each must convert its research into a marketable product. While Dr. Paciotti was a key player in this effort at CytImmune, as he is now at Senior Scientific, his involvement by no means guarantees success. Given the speculative nature of the products these companies seek to develop, CytImmune has not demonstrated a likelihood that irreparable harm will flow from Dr. Paciotti continuing work at Senior Scientific during the pendency of this case.

The balance of equities also favors Dr. Paciotti. As discussed above, the non-compete Agreement would, if enforced, prevent him entirely from working or investing in the industry that is his life's work.

Finally, enforcing the Agreement would harm the public interest. At Senior Scientific, Dr. Paciotti is the driving force behind the development of iron-oxide nanopartical technology. *See* Verified Compl. ¶ 53. Issuing a preliminary injunction could delay the development of a potentially significant diagnostic tool in the fight against cancer.

## IV. CONCLUSION

After a careful review of the record as it currently exists, it is clear that CytImmune has failed to meet its burden with regard to any of the four *Winter* elements, and injunctive relief is inappropriate. *See Winter*, 555 U.S. at 20. Therefore, for the reasons stated in this Memorandum Opinion, as well as on the record at the bench trial on August, 26, 2016, it is hereby ORDERED that Dr. Paciotti has failed to prove that CytImmune materially breached his employment agreement by not paying him his entire salary each year, and that Plaintiff's renewed Motion for a Preliminary Injunction is DENIED. A separate Order follows.

Dated: September 8, 2016

/S/
Paul W. Grimm
United States District Judge

jlb