**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| **CYTIMMUNE SCIENCES, INC.,** | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-16-1010 |
| **GIULIO PACIOTTI,** | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiff CytImmune Sciences, Inc. ("CytImmune") filed suit against Dr. Giulio Paciotti alleging that he breached an Assignment of Inventions, Non-Disclosure, Non-Solicitation and Non-Competition Agreement ("Agreement" or "NDA") that he entered while working for the company. Verified Compl., ECF No. 2. CytImmune has moved to disqualify Dr. Paciotti's attorney, Jonathan Rose, and his current firm, Alston & Bird LLP ("Alston"). ECF No. 27. CytImmune contends that Rose and his former firm, Katten Muchin Rosenman LLP ("Katten"), served as CytImmune's outside counsel from 2004 through 2007, during which time Katten lawyers, including Rose, reviewed and commented on a non-compete agreement that was essentially identical to the one at issue in this case. Accordingly, CytImmune argues that Rose and his current firm have a conflict of interest in representing Dr. Paciotti that warrants disqualification and that Rose is a necessary witness in the case, an independent basis for disqualification. The Motion is fully briefed, Pl.'s Mem. Supp. Mot. Disqualify, ECF No. 27-1;

Def.'s Opp'n Mot. Disqualify, ECF No. 66,[1] and no hearing is necessary, Loc. R. 105.6 (D. Md.). Because I find a significant risk that Mr. Rose's prior representation of CytImmune materially limits his representation of Dr. Paciotti, I will grant CytImmune's Motion.

## Background

In 2003, Jonathan Rose began a four-year tenure as a partner at Katten focusing on labor- and employment-law matters. Rose Decl. ¶ 2, ECF No. 66-1; Schwinger Decl. ¶ 7, ECF No. 67-1; Tyler Decl. ¶ 5, ECF No. 65-1.[2] During Rose's tenure, Katten served as outside counsel for CytImmune. Marder Decl. ¶ 4, ECF No. 27-2. Mitchell Marder, who currently serves as CytImmune's Chief Legal Officer, also worked at Katten during the same time period, *id.* ¶¶ 2–3; Schwinger Decl. ¶ 6, and participated in the firm's representation of CytImmune, *see* Marder Decl. ¶¶ 6, 8 12. Robert Tyler, a Katten associate, also participated in the representation by offering legal advice on corporate-law matters. Tyler Decl. ¶¶ 3–5.

In his declaration, Marder states that Katten attorneys reviewed and commented on a NDA template developed in 2005 that is identical to the Agreement signed by Dr. Paciotti that is central to the dispute in this case. Marder Decl. ¶ 5. He also specifically asserts that he asked Rose to review the NDA in January 2007 to determine its validity and enforceability under Maryland law and to remedy any legal defects in the document. *Id.* ¶ 12. According to Marder,

---

[1] CytImmune did not file a Reply brief. ECF No. 67.

[2] Robert Tyler was an associate attorney at Katten from 2004 to 2007 focusing on corporate-law matters. Tyler Decl. ¶¶ 2, 5. CytImmune submitted a declaration from Tyler more than two months after filing its Motion for Disqualification and on the weekend before Dr. Paciotti's Opposition was due. *See* ECF No. 54 (establishing June 27, 2016 deadline for Opposition); Tyler Decl. (submitted on June 25, 2016). CytImmune explained that difficulty locating Tyler accounted for the tardiness of its submission. Pl.'s Supp. Submission ¶¶ 3–4, ECF No. 65. The Defense questions CytImmune's motives for the late submission and urges the Court to refrain from considering the declaration. Def.'s Opp'n Mot. Disqualify 2 n.1. But as the Defense, acknowledges, "the Tyler Declaration adds nothing to Plaintiff's Motion" and contains only "generalized statements." *Id.* Accordingly, I will consider the declaration to the extent it adds any factual clarity.

Rose identified no deficiencies in the NDA. *Id.* ¶¶ 17, 22–23, 25, 30. Rose disputes Marder's account. Outside of "vague recollection[s]" based on documents discovered during the litigation, Rose has no "recollection whatsoever of ever working with [CytImmune] while at Katten" or any "recollection of being aware of the existence of a company called CytImmune." Rose Decl. ¶ 3. Despite the fogginess of his memory on the topic, Rose incongruously states that he "had no involvement at all in the drafting of CytImmune's boilerplate non-compete agreement, and was never requested to provide a general (or specific) opinion on whether the non-compete agreement was enforceable as drafted." *Id.* ¶ 7.

Rose admits, however, that the contemporaneously created documentary evidence produced in support of CytImmune's Motion demonstrates his involvement in Katten's work for CytImmune during a one-week period in January 2007. Rose Decl. ¶ 4. That week, Marder, Tyler, Rose, and Katten associate Hana Brilliant all participated in drafting a termination letter and severance agreement for an outgoing employee. Marder Decl. ¶¶ 8, 11; Rose Decl. ¶ 6. In response to a chain of emails discussing the draft letter, CytImmune CEO Lawrence Tamarkin sent a copy of the company's NDA, which included a non-compete agreement, to Brilliant, Rose, Marder, and Tyler. Email from Lawrence Tamarkin, CEO, CytImmune Sciences, Inc., to Hana Brilliant, Jonathan Rose, Mitchell Marder, and Robert Tyler, Katten Muchin Rosenman, LLP (Jan. 23, 2007, 10:13 A.M.), Unredacted Marder Decl. Attach. 1, at 40–41, ECF No. 53.[3] In all relevant respects, the NDA Tamarkin provided to Katten is identical to the Agreement signed by Dr. Paciotti. *Compare* Redacted Marder Decl. Attach. 1, at 42–46, ECF No. 27-2, *with* Pl.'s

---

[3] CytImmune originally only provided redacted attachments to the Marder Declaration. *See* ECF No. 27-2. The unredacted version of the attachments is referred to as "Unredacted Marder Decl. Attach. 1," while the redacted version is referred to as "Redacted Marder Decl. Attach. 1." Page numbers for citations to the attachments to the Marder Declaration refer to CM/ECF page numbers.

Opp'n Summ. J. Ex. C, ECF No. 74-2. Shortly after receiving the copy of the NDA, Brilliant emailed Tamarkin, Rose, Marder, and Tyler to advise that she had prepared two alternative severance-agreement drafts in both of which she referenced the NDA. Email from Hana Brilliant, Associate, Katten Muchin Rosenman, LLP, to Lawrence Tamarkin, CEO, CytImmune Sciences, Inc., Jonathan Rose, Mitchell Marder, and Robert Tyler, Katten Muchin Rosenemann, LLP (Jan. 23, 2007, 11:38 A.M.), Unredacted Marder Decl. Attach. 1, at 51–52. During this same one-week period, Tyler emailed CytImmune employees to recommend that an unidentified "subcontractor . . . execute CytImmune's NDA," and expressed his opinion that requiring the subcontractor to sign the document might "appear a bit heavy handed, but . . . would protect CytImmune." Email from Robert Tyler, Katten Muchin Rosenman, LLP, to CytImmune Sciences, Inc. (Jan. 22, 2007, 2:08 P.M.), Unredacted Marder Decl. Attach. 1, at 34.[4] The email's subject line indicates that he reached this conclusion at a time proximate to a phone conversation he had with Rose, though Tyler did not specify the subject their conversation. *See* Redacted Marder Decl. Attach 1, at 34 ("Subject: Re: Spoke with Jonathan, he should be giving you a call soon").

In March 2016, CytImmune filed its complaint against Dr. Paciotti in the Circuit Court for Montgomery County. Verified Compl., ECF No. 2. Dr. Paciotti's out-of-state attorney retained Rose as local counsel to handle the case. Pl.'s Mem. Supp. Mot. Disqualify 5. Shortly thereafter, CytImmune notified Rose of its belief that he had a conflict of interest in the case.

---

[4] Periodically throughout this Memorandum Opinion and Order, I quote from and reference unredacted versions of emails between CytImmune and Katten attorneys and among Katten attorneys regarding the CytImmune representation that CytImmune originally provided to the Court in redacted form. Although the attorney-client privilege ordinarily would apply to the emails, CytImmune's decision to introduce them as evidence supporting its Motion to Disqualify waives the privilege; however, pursuant to Fed. R. Evid. 502(d), I will limit that waiver to the specific exhibits filed.

Pl.'s Mem. Supp. Mot. Disqualify Ex. B, at 63–64, ECF No. 27-2.[5]  Rose consulted his firm's general counsel, who concluded that no conflict existed.  *Id.* at 63.  Dr. Paciotti then removed the case to this Court, Notice of Removal, ECF No. 1, where CytImmune filed the instant Motion to Disqualify.

## Standard of Review

As explained in *Jarallah v. Thompson*, 123 F. Supp. 3d 719 (D. Md. 2015):

> A motion to disqualify is a serious matter, which must be decided on a case-by-case basis.  This is so because two significant interests are implicated by a disqualification motion: the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community.  Nevertheless, the guiding principle in considering a motion to disqualify counsel is safeguarding the integrity of the court proceedings.  Thus, this court must not weigh the competing issues with hair-splitting nicety but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing an appearance of impropriety, [this Court] is to resolve all doubts in favor of disqualification.

*Id.* at 731 (quoting *Penn Mut. Life Ins. Co. v. Berck*, No. DKC 09-0578, 2010 WL 3294309, at *3) (D. Md. Aug. 20, 2010) (alterations in original)).  In light of this balance, the movant bears "a high standard of proof," *Franklin v. Clark*, 454 F. Supp. 2d 356, 364 (D. Md. 2006), to demonstrate that the attorney has violated "a rule of professional conduct that requires disqualification," *Jarallah*, 123 F. Supp. 3d at 732; *see also* Loc. R. 704 (making applicable the Maryland Lawyer's Rules of Professional Conduct (MLRPC) established by the Maryland Court of Appeals).

## Discussion

CytImmune contends that Rose should be disqualified pursuant to MLRPC 1.9, which governs an attorney's obligation to a former client, MLRPC 1.7, which addresses conflicts of

---

[5] Page numbers for citations to the attachments to Exhibit B to the Plaintiff's Memorandum in Support of its Motion to Disqualify refer to CM/ECF page numbers.

interest as they pertain to current clients, and MLRPC 3.7, which restricts a lawyer's ability to serve as a witness in his client's case. Pl.'s Mem. Supp. Mot. Disqualify 8. And as MLRPC 1.10 imputes attorneys' conflicts to their firms, CytImmune also asserts that Alston must be disqualified. *Id.* Finally, CytImmune contends that Rose should be disqualified pursuant to MLRPC 1.16, which requires a lawyer to decline or terminate representation that would violate the Rules. *Id.* 27. As violation of another Rule is a predicate for violation of MLRPC 1.16, I restrict my analysis to the aforementioned Rules.

MLRPC 1.9

MLRPC 1.9 prohibits an attorney from representing a client "in the same or a substantially related matter" in which he has represented a former client, if the current and former clients' interests are "materially adverse." MLRPC 1.9(a). Absent informed consent from the former client, the same prohibition applies when the lawyer's firm has represented the former client "in the same or a substantially related matter" and the lawyer "acquired information . . . that is material to the matter." *Id.* 1.9(b).

There is no dispute that Rose represented CytImmune during his tenure at Katten, although the parties disagree over the scope of that representation, and there is no dispute that CytImmune has not consented to Rose and Alston's representation of Dr. Paciotti in this case. *See* Marder Decl. ¶¶ 7–30; Rose Decl. ¶¶ 4–7. And while Defendant argues that "the *position* that Dr. Paciotti is taking in this case [(i.e. that the NDA is invalid as applied to Dr. Paciotti)] is in no way materially adverse" to the advice he purportedly gave to CytImmune (i.e. that the NDA was facially valid), Def.'s Opp'n Mot. Disqualify 17 (emphasis added), there is also no dispute that Dr. Paciotti's and CytImmune's *interests* are materially adverse, since they are opposing parties in this litigation. *See K & S Real Properties, Inc. v. Olhausen Billiard Manuf.*,

*Inc.*, 2016 No. ELH-15-1199, 2016 WL 915607, at *6 (D. Md. Mar. 10, 2016) (noting that parties' interests were materially adverse where attorney's current client was suing his former client). Hence, Rose and Alston must be disqualified from representing Dr. Paciotti if his representation of CytImmune involved "the same or a substantially related matter" to the current litigation's subject matter. *See* MLRPC 1.9. "Matters are 'substantially related' . . . if there . . . is a substantial risk that confidential factual information as normally would have been obtained in the prior representation would materially advance the client's position in the subsequent manner . . . ." MLRPC 1.9, cmt. 3. But, at the same time, "an attorney who recurrently handled a type of problem for a former client is not precluded for that reason alone from later representing another client in a factually distinct problem even though the subsequent representation involves a position adverse to the prior client." MLRPC 1.9, cmt. 2.

The record lacks clarity on the degree (if any) to which Rose gave legal advice to CytImmune concerning its non-compete agreement or whether, through Katten's broader representation of the company, he acquired material information relating to the agreement. Rose does not, however, dispute Marder's contention, Marder Decl. ¶ 5, that Katten reviewed and commented on CytImmune's non-compete agreement. And while Rose insists that he did not personally provide any legal advice concerning the NDA, Rose Dec. ¶ 7, he has only a "vague recollection" of the work that he performed for CytImmune, *id.* ¶ 3, so his adamant denial lacks substantial force. Given the admitted gaps in Rose's recollection, I cannot credit his account of the scope of his work for CytImmune.

The documents provided in support CytImmune's motion do provide some circumstantial evidence of Rose's involvement in legal advice concerning the NDA. The January 2007 email correspondence among Katten lawyers and with CytImmune establishes that Rose participated in

Katten's representation of the company in connection with the termination of one of its employees. *See* Email from Robert Tyler, Associate, Katten Muchin Rosenman, LLP, to Jonathan Rose, Partner, Katten Muchin Roenman, LLP (Jan. 22, 2007, 11:22 AM), Unredacted Marder Decl. Attach. 1, at 23 (Tyler asking Rose to call CytImmune CEO Lawrence Tamarkin to discuss termination of an employee). Katten's communication with CytImmune regarding the termination prompted CytImmune CEO Lawrence Tamarkin to send Rose and the other Katten attorneys involved in the matter a copy of the company's NDA. Email from Lawrence Tamarkin, to Hana Brilliant, Jonathan Rose, Mitchell Marder, and Robert Tyler, Unredacted Marder Decl. Attach. 1, at 40. While it is clear that that Rose received a copy of the NDA, it is not clear why Tamarkin provided the document to the attorneys or what if any advice Rose or the other Katten attorneys provided concerning it. Shortly after receiving the copy of the NDA, Brilliant emailed Tamarkin, Rose, Marder, and Tyler with two alternative severance-agreement drafts for the outgoing employee. Email from Hana Brilliant, to Lawrence Tamarkin, Jonathan Rose, Mitchell Marder, and Robert Tyler, Unredacted Marder Decl. Attach. 1, at 51–52. In her email, Brilliant emphasized that each of the drafts "included language . . . to reflect the non-disclosure/non-compete agreement in place." *Id.*

At a minimum, this correspondence makes clear that the NDA was discussed as part of Katten's representation of CytImmune in connection with the termination of one of its employees, that Rose participated to some degree in this work, and that Katten endorsed incorporation of the NDA into the severance agreement it drafted for CytImmune. The commentary to the MLRPC emphasizes that while "an attorney is not expected to give advice until asked by the client," the attorney's duty to communicate "may require that [he] offer advice" where "the client proposes a course of action that is likely to result in substantial adverse

legal consequences to the client." MLRPC 2.1, cmt. 5. As incorporating an unenforceable NDA into a severance agreement would have serious legal consequences for CytImmune (namely permitting a terminated employee to work for or disclose sensitive information to a competitor), it can be inferred from the correspondence that the Katten attorneys working on the termination either explicitly or implicitly advised CytImmune that the NDA was enforceable.

This conclusion is reinforced by the fact that Tyler advised CytImmune during the same week in January 2007 to have a subcontractor sign the NDA because doing so "would protect CytImmune." Email from Robert Tyler, to CytImmune, Unredacted Marder Decl. Attach. 1, at 34. As an unenforceable NDA affords no protection to a client, this comment indisputably amounts to legal advice concerning the Agreement. Rose is at least loosely tied to Tyler's advice because the subject line of the email in which Tyler discussed the NDA reads, "Spoke with Jonathan [Rose], he should be giving you a call soon." Redacted Marder Decl. Attach 1, at 34. Although the email does not identify Rose as the source of the recommendation concerning the NDA, Tyler's reference to him in the email's subject line coupled with the fact that Tyler handled corporate-law matters for CytImmune, not labor-and-employment matters, Tyler Decl. ¶ 5, supports an inference that Rose either opined on the enforceability of the Agreement or expressed no reservation about the enforceability of the NDA under circumstances where Tyler reasonably would have expected him to do so.

All told, the documents supporting CytImmune's Motion present at best an incomplete picture of Rose's involvement in any advice that Katten offered CytImmune concerning the NDA's enforceability. On the one hand, it is questionable whether CytImmune has met the "high standard of proof" demanded of it in order to secure the disqualification of an attorney under MLRPC 1.9. *See Franklin*, 454 F. Supp. 2d at 364. On the other hand, I must "resolve all

9

doubts in favor of disqualification," *Jarallah v. Thompson*, 123 F. Supp. 3d at 731 (quoting *Berck*, 2010 WL 3294309, at *3), and the correspondence does permit the reasonable inferential conclusion that Rose either himself advised CytImmune that the NDA was enforceable or participated in conversations at the firm in which the Agreement's enforceability was discussed. Ultimately, however, it is not necessary that I determine whether this evidence merits disqualification under MLRPC 1.9 because a compelling case exists for disqualification pursuant to MLRPC 1.7.

## MLRPC 1.7

CytImmune also contends that Rose should be disqualified pursuant to MLRPC 1.7 because Rose's obligations to CytImmune as a former client "materially limit[s]" his representation of Dr. Paciotti.[6]  Pl.'s Mem. Supp. Mot. Disqualify 15–17 (quoting MLRPC 1.7(a)(2)).  Without written informed consent (absent here) from the affected parties, a lawyer may not represent a client where "a significant risk" exists that representation of the client "will be materially limited by the attorney's responsibilities to another client, a former client or a third person or by a personal interest of the attorney."  MLRPC 1.7(a)(2).  MLRPC 1.7 protects clients from situations where a lawyer's ethical obligations would prevent him from "consider[ing],

---

[6] The Defense argues that CytImmune has no standing to pursue disqualification under MLRPC 1.7 because the rule protects Dr. Paciotti's interests, not CytImmune's.  Def.'s Opp'n Mot. Disqualify 16–17.  CytImmune responds that its attorneys have an obligation as members of the bar to apprise the Court of "facts justifying a disqualification of counsel."  Pl.'s Mem. Supp. Mot. Disqualify 8 n.5 (quoting *United States v. Clarkson*, 567 F.2d 270, 271 n.1 (4th Cir. 1977).  This Court has reached the merits of an opponent's argument for disqualification under MLRPC 1.7. *Franklin v. Clark*, 454 F. Supp. 356, 368–72 (D. Md. 2006).  And in other Fourth Circuit courts, litigants have successfully argued for the disqualification of their opponents' attorneys pursuant to MLRPC 1.7 analogues.  *See, e.g.*, *Sanford v. Commonwealth of Virginia*, 687 F. Supp. 591, 605 (E.D. Va. 2009) (granting Plaintiffs' Motion to Disqualify, which addressed defense counsel's conflict in representing all co-defendants in a medical malpractice lawsuit).  Accordingly, I do not find that CytImmune lacks standing to raise MLRPC 1.7 as a ground for disqualifying Rose.

recommend[ing] or carry[ing] out an appropriate course of action for the client," thereby "foreclos[ing] alternatives that would otherwise be available to the client."  MLRPC 1.7, cmt. 8.  But only a "significant risk," and not "[t]he mere possibility of subsequent harm . . . requires disclosure and consent."  *Id.*

Given Rose's "vague recollection" concerning the scope of his representation of CytImmune, Rose Decl. ¶ 3, neither he nor the Court can rule out the possibility that he provided legal advice to the company about the enforceability of its NDA.  Moreover, Marder expresses no reservation at all regarding his memory of the events, and has a clear recollection that Rose did in fact provide such counsel.  Marder Decl. ¶¶ 17, 22–23, 25, 30.  Although the lack of contemporaneous evidence supporting Marder's recollection prevents me from determining conclusively whether Rose analyzed the enforceability of the agreement, the record reflects a clear possibility that Rose did provide such legal advice.

Rose's incomplete recollection of his prior work for CytImmune creates a significant risk of a materially limited defense of Dr. Paciotti.  Unable to discount the possibility that he did render an opinion on the legality of the NDA, Rose has triangulated his defense of Dr. Paciotti so as to avoid making a facial challenge to the NDA and to instead pursue other strategies to advance Dr. Paciotti's interests, arguing that the NDA is invalid *as applied* to Dr. Paciotti.  Without second-guessing Rose's and his co-counsel's litigation tactics, I cannot help but note the Defense's decision to refrain from making a facial challenge in its preliminary-injunction briefing to what I already have ruled was a sweepingly broad non-compete Agreement, *see* Def.'s Opp'n Mot. Prelim. Inj., ECF No. 34, and I am troubled by the prominent role that the absence of a facial challenge played in its opposition to the Motion to Disqualify, *see* Def.'s

Opp'n Mot. Disqualify 5, 10 n.8, 17, 19.[7] I certainly do not discount the possibility that an as-applied challenge is the strongest argument that can be marshalled in support of Dr. Paciotti's position. It is, however, difficult for me to understand how making a facial challenge to a non-compete agreement as broad as CytImmune's, even as a secondary argument, would compromise Dr. Paciotti's case. To the contrary, my denial of CytImmune's Motion for a Preliminary Injunction to enforce the NDA against Dr. Paciotti was substantially (but by no means exclusively) based on the overbreadth of the NDA.

Indeed, my concerns about Rose's ability to represent Dr. Paciotti without material limitation were reinforced by the briefing on CytImmune's Motion for Reconsideration of my Order denying its Motion for a Preliminary Injunction. Despite the Defense's failure to make a facial challenge, I denied CytImmune's Motion for a Preliminary Injunction because I found the non-compete Agreement facially invalid. Sept. 8, 2016 Mem. Op. 8, ECF No. 96. I was able to do so, despite Dr. Paciotti's failure to raise a facial challenge, because the burden was on CytImmune at the preliminary-injunction stage to demonstrate the facial validity of its non-compete Agreement rather than on Dr. Paciotti to establish its invalidity. Nov. 22, 2016 Mem. Op. & Order 4–5, ECF No. 117. In its Motion for Reconsideration, CytImmune emphasized the Defense's prior statements about the facial validity of the Agreement in its Opposition to the

---

[7] The Defense repeatedly emphasizes its decision to refrain from making a facial challenge in its Opposition to the Motion to Disqualify. Def.'s Opp'n Mot. Disqualify 5 ("Dr. Paciotti is not making a *facial challenge* to the restrictive covenants at issue, but is instead challenging whether Plaintiff is entitled to enforce those restrictive covenants under the particular facts of the case. . . . In other words, this case presents an 'as-applied' challenge to the restrictive covenants, and not a 'facial' challenge."), 10 n.8 ("Dr. Paciotti is not disputing the facial enforceability of the restrictive covenant at issue . . . ."), 17 ("Dr. Paciotti is not challenging the enforceability of the non-compete in the abstract, but only as applied to Dr. Paciotti. . . . [T]he non-compete agreement at issue is legally enforceable as written . . . ."), 19 ("Dr. Paciotti is not contesting the enforceability of his non-compete in a general sense, nor does he contend that the definition of competitor is per se unenforceable because it is overbroad.").

Motion to Disqualify. Pl.'s Mot. Reconsideration 3, ECF No. 101. Hamstrung by the position it took in the Motion-to-Disqualify briefing, the Defense conspicuously avoided discussing the overbreadth analysis articulated by the Court but rather generally noted the Court's authority in certain circumstances to *sua sponte* make findings of fact and conclusions of law, Def.'s Opp'n Mot. Reconsideration 1–2, ECF No. 106, and rehashed its as-applied challenge to the non-compete Agreement, *id.* 4–6. This is too clever by half. I have little doubt that another, less constrained lawyer would have attempted to make a full-throated facial challenge to the breadth of the NDA.

I am left with the impression that Rose's inability to recall the precise details of his prior work for CytImmune placed him squarely between the Scylla of MLRPC 1.9 and the Charybdis of MLRPC 1.7. And if Odysseus could not navigate such treacherous waters, then, respectfully, neither can Rose. And the Rules forbid any such attempt. In light of the apparent constraints that I have observed Defense counsel struggle with, I am persuaded that Rose cannot continue to represent Dr. Paciotti without a significant risk of a materially limited defense. Accordingly, I find that Rose has a conflict of interest in representing Dr. Paciotti. Additionally, MLRPC 1.10(a) imputes Rose's conflict to all of the attorneys at Alston. Waiver of the conflict is possible, but only with the informed consent of "each affected client." MLRPC 1.7(b); *see also* MLPRC 1.10(d) (allowing waiver of imputed conflicts according to the requirements enumerated at MLRPC 1.7(b)). CytImmune has made clear that it will not consent to Rose's representation of Dr. Paciotti. Pl.'s Mem. Supp. Mot. Disqualify 17. Accordingly, both Rose and Alston are disqualified from representing Dr. Paciotti in the remainder of this litigation.

### MLRPC 3.7

CytImmune also argues that Rose should be disqualified from representing Dr. Paciotti because he is likely to be called as a fact witness in the case. Pl.'s Mem. Supp. Mot. Disqualify 19–27. Specifically, CytImmune intends to call Rose as a witness to counter Dr. Paciotti's argument that the company waived the Agreement by encouraging Dr. Paciotti to apply for jobs with other companies. *Id.* at 20. CytImmune anticipates that Marder will testify that he discussed with Dr. Paciotti only job opportunities that would not infringe upon the Agreement and that he did so based upon advice given by Rose about the NDA's scope. *Id.* at 20–22. In addition, CytImmune intends to bolster that testimony by probing Rose's recollection of the advice he provided concerning the Agreement. *Id.* at 22–25.

> MLRPC 3.7 bars an attorney from:
>
> act[ing] as an advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client.

MLRPC 3.7. Given the significant divergence between Rose's recollection of the legal advice he provided concerning CytImmune's NDA and Marder's, I cannot discount the possibility that Rose will be called as a fact witness should the case proceed to trial. The Defense does not appear to disagree but argues that Rose need not be disqualified at this juncture because the conflict contemplated by the Rule is only triggered "at trial," which has not yet been scheduled. Def.'s Opp'n Mot. Disqualify 18–20. The Defense cites no case law in support of its position. In any event, because I find Rose disqualified under MLRPC 1.7, I do not find it necessary to resolve the issue.

## Conclusion

While the scope of Rose's prior representation of CytImmune is disputed, Rose's very uncertainty about the parameters of his prior representation materially limits his ability to

represent Dr. Paciotti.  MLRPC 1.7 exists for the very purpose of ensuring that a litigant's claims or defenses are not refracted through the multifaceted prism of an attorney's conflicts.  Dr. Paciotti is entitled to a lawyer whose ability to develop a theory of the case is unencumbered by his own uncertainty concerning his representation of a former client.  I am persuaded based on how this case has evolved that Rose and the other lawyers at Alston are unable to provide such unfettered counsel.  CytImmune's Motion to Disqualify is GRANTED.

## ORDER

Accordingly, it is this 5th day of January, 2016 by the United States District Court for the District of Maryland, hereby ORDERED that:

1. Plaintiff's Motion to Disqualify, ECF No. 27, IS GRANTED.

2. Defendant SHALL FILE a status report on or before February 6, 2017 regarding his efforts to obtain replacement counsel.

                                    /S/
                              Paul W. Grimm
                              United States District Judge

jlb